and Taylor. Ms. Shapiro. Thank you, Your Honors, and may it please the Court. My name is Alexandra Shapiro, and I'd like to address our two principal arguments, why the government had to prove a gap violation in the unique context of this case and failed to do so, and why, even if that's not the case, the erroneous conscious avoidance of this construction. Can you stop for a second? I can't. My screen was off. I'm sorry. It's on now. Hello. Go ahead. Thank you. And why, even if that's not the case, the erroneous conscious avoidance instruction would require reversal. First, with regard to the gap violation, it's important for me to emphasize that Mr. Petit was only convicted of a single count of securities fraud, and the sole theory of securities fraud underlying that conviction was the theory that MiMedx's revenues were inflated and that the company had recognized more revenues than were permitted under gap at the particular times in question. And in that respect, the government had to prove a gap violation here in this case, as distinguished from the three cases on which the government relies, Evers, Regas, and Simon, which did not involve that type of charge. In addition, in those cases, for example, and we discussed this extensively in our brief, but in those cases, the charge wasn't based on a violation of gap. It was based on other failures to disclose and conceal. And here, the testimony showed that the gap rule in question was subject to judgment. It wasn't black and white. And because of that, the government had to show that there was no reasonable reading of gap that supported the numbers here. There is no reasonable reading at all. I mean, if they have the actual accountants who say that if I knew all the circumstances, I would have reported it differently. Why isn't that prohibitive? Well, the testimony wasn't nearly that definitive, Your Honor, with all due respect. Well, just first of all, just to get to the gap question, if it were definitive, and I understand you're saying that it's not, but if it were definitive, would that be enough if the actual auditors and accountants said, I would have reported it differently if I had known all the circumstances? Well, Your Honor, as you know, we've also argued that the particular testimony by these accountants was improper lay opinion and shouldn't have been admitted because the government had to prove the gap violation in this context by an expert that would have provided notice to the defense. Yeah, but I guess that's my question is why do they have to do that if they have the actual accountants that are responsible for the reporting and they say they would have reported it differently? Well, Your Honor, two reasons. I mean, number one, I think that the testimony that was actually given in this case establishes that this particular rule was not black and white. It was subject to interpretation. That was the testimony repeatedly, for instance, of Anderson, who talked about how there were legitimate disagreements about the accounting, who talked with specificity about with respect to some of the issues like right of return, that one needed other information, and then it depends on certain factors. And the testimony was equivocal. But I think the point here is that the evidence of the two accountants, even if one accepts them and rejects the argument that expert testimony was needed here, amounts to a showing that this was not a black and white rule. And therefore, under Connolly, under Kickslaw, from other circuits like Hanna and Whiteside, under the Supreme Court's decision in Safeco, when you have a rule, whether it's a legal rule, an accounting rule, or an industry rule like the one in Connolly, that is subject to reasonable, that doesn't have one true clear answer, the government has to prove that there is no reasonable reading that supports, in this case, the numbers in question. And they simply didn't do that. That wasn't established by this testimony. Okay. I think we have that argument. You were going to say something about the conscious avoidance instruction, and I guess my question is, didn't we approve a conscious avoidance instruction like this one in Schultz? No, Your Honor. The conscious avoidance instruction in Schultz was quite different. In Schultz, the instruction effectively did convey, although not in exact words, the two key components of an instruction that this court has repeatedly insisted on. And indeed, in Schultz, for instance, the district judge specifically said to the jury that they couldn't make the conscious avoidance finding based on mere negligence or inadvertence. And here, there's nothing like that. The instruction doesn't do that. It does not convey the high probability because it's framed in terms of an example. It says the jury may find it. It doesn't tell them that they must, in order to make the finding, find the defendant knew of a high probability of the particular fact. And in addition, there's nothing whatsoever about actual belief in the instruction. And I see my time has run out. The last point I did want to make is that in the first instance, I just want to remind the court that our primary, our first argument is that there shouldn't have been a conscious avoidance instruction at all because the alleged basis for it was this Anderson email. And Mr. Petit referred that to the audit committee. There was simply no basis to say that he deliberately stuck his head in the sand in response to that. Okay, thank you very much, Ms. Shapiro. We'll turn to the other appellant, Mr. Marmer.  Good morning, Your Honors. May it please the court, Nathaniel Marmer for Mr. Taylor. Your Honor, in the limited time that I have, I would like to focus on the conscious avoidance instruction, both the fact that it shouldn't have been given because there was no factual predicate for it, and second, that the language used was improper and has been condemned by this court repeatedly over the last few decades. With respect to the fact that it shouldn't have been given, the government's theory on the factual predicate was, as Ms. Shapiro noted, the Anderson email of January 2016. That email, though, should not have alerted Mr. Taylor that there was a problem at all that he needed to investigate further. To begin, it referred to two transactions, SLR and stability, which is largely acknowledged. He had no understanding what the alleged problematic issues were. The third transaction it referenced was the first medical transaction in June 2015. Again, that was a transaction in which he was involved, but the terms of that were well known. It had been passed on by all members of MiMedx. There was no hidden agenda there, no hidden facts, and there was no problem with it whatsoever. Upon receiving the Anderson email, Mr. Taylor had no reason to do anything further. In this case, it really packed a powerful punch, the conscious avoidance instruction, because it allowed the jury to bridge the gap between what was essentially the defense, which was, hey, look, we're salesmen here, we're pushing sales, we'll leave the accountants, and then use that conscious avoidance to bridge the gap from there to the government's theory of guilt, which they knew they should have known, as they put it. In terms of the actual language here, it is clear that the instruction I was given suffered from numerous faults. But just to be clear, the instruction doesn't say knew or should have known, right? No, but that is what – the danger, as this Court has repeatedly said, of an improper conscious avoidance instruction, and in particular the failure to give a high probability instruction, is that the jury may well convict based on a theory of negligence or recklessness or even foolishness. And so here – So the actual language that this Court used about purposefully remain ignorant of the true facts would not encompass negligence, but you're saying – we've said that the jury might understand it that way. Well, it doesn't – yes, I mean, that's what this Court has said, and it needs to temper that language with the high probability, because – and also the actual belief. Because here, for example, the defendants may have thought that, well, we're doing these deals, and we actually believe that however they were structured, at the end of the day, the investors are being told what the true numbers are, even if it turns out that they were wrong on that fact, but they actually believed it. And that's one of the reasons, similar to Kaiser, where this Court found that it was a plain error to fail to give the actual belief language. Here, of course, the Court only said that – I'm sorry, I thought I was hearing your question. No, go ahead. Oh, I apologize. So, again, without that high probability and actual belief language, the jury was, as this Court has said repeatedly, there was a great danger that it could inject undue negligence. And that's really what – you know, Mr. Taylor was the chief operating officer of this company. He was not an accountant. He had no accountant training. He was not in the line of reporting with respect to any of the financial departments. And the jury may well have said, you know, but he is the chief operating officer. He has very big responsibilities at the company. He should have done more. He should have done more to investigate and to uncover what the government said were the problematic aspects of these transactions, and more particularly, that revenue was supposedly being improperly or illegally inflated. Okay. Thank you, Mr. Marmer. You've reserved time for rebuttals to hear from you again, but let's turn to the appellee, Mr. Tracer. Thank you. Good morning. May it please the Court, my name is Daniel Tracer, and I represent the United States in this appeal and at trial below. The defendant's arguments, in fact, both arguments that were just argued to your honors about the gap violation as well as the conscious avoidance, both proceed from a faulty premise. They simply misdefine the allegations in the case and what the proof was at trial, and then they proceed to make arguments based on that. They proceed as if the allegation in the indictment and what was proved at trial was simply a reporting error, a failure to comply with gap. As if all the facts were out in the open, the company made decision X, but the government thinks it should have been decision Y, and that's the whole case. And that has some resemblance to the U.S. v. Hara case that they cite in the Third Circuit, but it is not at all what this case is about. Your honors, this case was about lie after lie after lie, about how the defendants lied within their company and without their company in order to cause revenue to be recognized that otherwise would not have been recognized. They lied about the true... The challenge is a misrepresentation to investors, right? Well, ultimately that, the investors are then deceived because they get financial statements which are reported to be or represented to be the result of this company's process, the auditors, the accountants all signing off on this. So they get financial statements that are represented to be developed in accordance with gap, right? So if they were in fact developed in accordance with gap, reflected transactions the way gap would have recorded them, then how is it possible there's a misrepresentation? So, your honor, that's exactly the argument that was made in Regas, Ebers, and Simon, that even if we lied internally, and even if our financial statements were misleading, and even if we put things in there that shouldn't have been in there, well, if fortuitously it so happens that it works out that it actually complies with gap, then that's a defense. And the court in Regas said that it's been the long-held view in this circuit that gap neither establishes nor shields guilt in a securities fraud case. So the defendants' arguments run headlong into this court's holdings in Simon, Regas, and Ebers. In fact, the defendants in Simon called that... So you're saying that there would be misrepresentation even if all the reporting was compliant with gap? Exactly, your honor. So how would that work? So, like, there actually were transactions with these companies. I understand you're saying that they were set up for an illicit purpose. But let's imagine that gap actually allows these transactions to be reported this way, that it's totally consistent with gap. How could you say there's a misrepresentation to investors if there actually is a deal and they're reporting it in accordance with gap? Sure. The way the revenue gets on the financial statements here is because Petit and Taylor lied to the accountants to get it on. If the defendants could find an expert and call a trial and say, well, it just so happens that the way the transaction worked out does technically comply with gap, that would go to good faith, perhaps, but it's not a defense. It doesn't mean that the defendants didn't engage in a scheme to deceive, which is what the law requires. But I understand that they engaged in a scheme to deceive. But what would the deception be? Sure. The deception is that there were levels and multiple lies here, that they lied internally to get this revenue, and ultimately the revenue is then inflated. If the internal accountants and the company's auditors had known the truth, the testimony was unequivocal that the financial statements would not have reflected the revenue that they, in fact, did. And there was ample testimony that that's what everybody cared about in this case. That's what the defendants cared about. That's what the investors cared about. All everybody cared about was the revenue growth. And the evidence established overwhelmingly that they lied in order to artificially inflate the revenue. If somehow the fact – So they actually did have a deal with these other companies, entities, right? It's just that you're saying that there was no expectation that the revenue was actually going to be collected. Correct. The transaction – But if it were true that you could have such a deal, and even when it was questionable whether the revenue would be collected, GAP allowed you to report it as revenue, then wouldn't that just be a problem with GAP? Well, it might go to the defendants' good faith argument, right? They might be able to say, well, even though we were withholding facts internally, because we actually thought it complied with GAP, maybe that would be a defense. But again, that's the argument that was tried in Regas. It's the argument that was tried in Simon. It wouldn't save the defendants from the fact that they lied. I'm not talking about what their motivation was for withholding it internally. I'm talking about whether the investors outside would have been subject to a misrepresentation. Well, of course, the investors, based on the certifications, based on the content of the financial statements, understand that revenue is reported as a result of how the company properly adheres to its own internal procedures and controls. If the CEO of the company is lying to the accountants to get that revenue on the financial statements, then the investors are being deceived. They think they are getting a proper accounting of a public company, and they are not. And both Mr. Anderson and Mr. Urbizo, and, you know, I know the defendant's brief kind of cherry-picks certain lines, but I can give your honors. So you think it's sufficient for liability to show that they were lying to the accountants internally, and you wouldn't need to separately show that the investors were being misled by the information that they received? Well, we would also need to show intent, right? We would need to show that they lied to the accountants in Actus Reis, and we would need to show in Mens Reis that the reason that they did that was to artificially inflate the stock price, which is a misrepresentation, you know, by putting out false statements to the investors. So we would need to show both that they lied and that they intended to deceive. And here we showed that… You would have to actually show a deceit on investors, don't you? Yeah, absolutely, yes. And here, if they got financial statements that were the products of lies and falsehoods and misleading omissions, then the investors have been deceived. And, you know, again, the lies here were myriad. Lies about the bride payment, lies about the swaps, lies that Petit withheld that his own children funded payments from one of the company's suppliers, as well as a hidden right of return that he granted to one of the companies that he actually sent by FedEx because he wanted to keep it off of the company's servers so that they wouldn't see it. So when the accountants and when the auditors get this information, and the result of that is the financial statements, the investors are deceived. You know, for example, in the wire fraud context, I know Your Honors are aware that there's no requirement even that the lie be made to the same person who's deceived. That would be convergence, and this Court has rejected that again and again, that we require convergence. We do not. So it's very clear that a scheme to lie within your company in order to manipulate the financial statements that are put out to the public is a cognizable scheme to defraud. I would direct Your Honors to the Royer case, which we cite, R-O-Y-E-R, which talks about the breadth of securities fraud and how it's broader than wire fraud. And so when properly framed, if I may step back, when properly framed, this is not a simple reporting requirement, and therefore, the government doesn't have to show gap, and the Court should decline, respectfully, I submit, the defendant's invitation to turn all cases into expert battles. Can you – gap plays a big part, at least in the discussion. I'm wondering whether you could clarify what role gap, which, after all, is not a statute. We're not legally, I guess, required per se to abide by gap. What role does gap play in the analysis, in the facts in this case, in the analysis? Absolutely. Gap plays essentially a background role in this case. In other words, it provides guidance, and the accountants and the auditors follow that guidance or take that guidance into account when they're making their decision. Ultimately, they have to show financial statements that are accurate and full and not misleading. And so they rely on gap, as they interpret it, to try and put out statements that are honest. So, you know, when the accountants and auditors testified, for example, they testified that they were following certain rules. And in that respect, this case is very similar to CUTI, Q-U-T-I, which this Court knows, where, again, accountants and auditors testified about there was a four-step test, kind of like there is here. There's a four-step test in gap for when you count these lease rebates that were at issue in CUTI. And the Court found that, A, the case did not revolve around gap. And second of all, more relevant for the holding here, that you can call accountants and auditors as materiality witnesses to testify that when they're implementing these rules, if they had been told the truth, they would have implemented the rules differently. That's exactly what the government put on here, and that's exactly what CUTI allows. And I think that's the role that gap plays. I understand that the testimony was otherwise here, but if, in fact, they had testified that they would not have reported it any differently had they gotten the additional information that was withheld from them, that the reporting was compliant with gap regardless, that would have meant there's no misrepresentation and no liability, right? It would raise a materiality issue, I think, Your Honor. I think it would raise a materiality issue about whether the lies— You said you called the accountants said that none of the internal withholding of information affected the reporting in any way. They still could have been liable? No, but I'm saying it might have undermined liability. But the reason it would have undermined liability is not because the government needs to show a gap violation. It's because there might be a real question there about whether the lies were material, right? So, in other words, if I lie to someone but it doesn't affect their decision, then that may be why we have materiality baked into the law. Right. So then if, in fact, the reporting was compliant with gap, like in my hypothetical where the reporting would have been exactly the same regardless, wouldn't that be a defense? Doesn't that mean you have to show that the reporting was inconsistent with gap in some way? Well, again, no. It's certainly not a per se defense. We called, in fact, investor witnesses who testified that the fact that the CEO of the company was withholding facts from the accountants and that they were relying on that in reporting revenue was absolutely material to them. And if the revenue was overstated such that the accountants would not have included it had they known the truth, that was material to the investors, investors who testified in this case that they had substantial holdings on behalf of funds. Yes, I understand. But you're saying that if, in fact, the accountants would have done something differently had they known the truth. Right. Exactly. Exactly. If they had not been lied to, it would have been different. And investors testified that that would have affected their decisions here. So here there's no question. We had materiality evidence and plenty of it. And I'll just add that the same, it's the same misframing of the case that I think leads to the conscious avoidance arguments that you see in the defendant's brief. Right. They argue that the Anderson email could not have put the defendants on notice about gap. But again, because this case is not a case about a reporting requirement, that's not what the Anderson email did. The defendants here are charged and were convicted of a scheme to lie to their accountants and lie to their auditors. When Mr. Anderson sent his email, what he was doing was he was shining a spotlight on certain transactions, in fact, the transactions that were at issue in our case. And so to the extent the defendants might have argued that, well, we didn't appreciate that we needed to disclose these facts or we didn't think these facts mattered, well, look, you have your accountant telling you these transactions are troubling. And so at that point, the defendants are on notice of a high probability that something is wrong. And at that point, the jury could find that they choose to ignore it. As we point out in the brief, I would just – and I realize I'm over my – What about the fact that Mr. Pettit referred the email to the Audit Committee? Sure. So the fact that Mr. Pettit referred the email to the Audit Committee, I just want to be – that's an important point because the defendants bring it up in their brief as if they tried to offer that evidence. Nowhere in the record – and I respectfully submit you can look in the record for this – nowhere in the record did they actually try to offer the fact that Petit elevated it to the Audit Committee. If you look in the appendix, they cite to the charge conference, which is obviously not where evidence is being offered. Questions about the Audit Committee's investigation only came up in the cross of Mr. Anderson. And at that point, they were permitted to ask whether he interviewed with the Audit Committee, but Judge Raycroft shut them down when they were trying to go into what the Audit Committee's conclusions were. At no point did anybody try to offer evidence that it was Pettit who elevated it to the Audit Committee. And so that evidence was never excluded. The defendants make it sound as if it were, but in fact it were not. And so I think that's an important point when your honors are considering the case, that that evidence was never offered. Again, I'm over my time, so if the court has any questions, I'm happy to answer them, but otherwise I'll yield. Thank you very much, Mr. Tracer. We'll turn back to Ms. Shapiro on removal. Thank you, your honors. Three points. First, the government is simply misframing the charges in this case and the way – what the jury's findings were. The only charge in the case that incorporated a theory that Mr. Pettit had defrauded – had lied to the auditors was the conspiracy count, which contained an object to that effect. The securities fraud count was entirely premised on the notion that there were false statements to investors, and contrary to Mr. Tracer's claim that Gap played only a background role, if you take a look at the indictment on pages A39 to 40, the indictment goes into detail about the specific requirements of Gap, which it says MiMedx had to comply with. On page 847 at the bottom, there's a paragraph overview of the accounting fraud scheme, and that paragraph on page 848 makes clear that the scheme allegedly was that Mr. Pettit and others caused MiMedx to report fraudulently inflated revenue figures. So that's what the case was about. Simon, Evers, and Regas were very different, contrary to Mr. Tracer's argument. For instance, in Regas, the issue was that the company had failed to disclose to the investing public that it was on the hook for certain co-borrowing arrangements and was jointly and severally liable for giant amounts of money. In Simon, there was a note to the financial statements that was false. In Evers, the issue was that even though the financials in certain part may have complied with Gap, the company failed to disclose that it had made an internal accounting change that it was not disclosing that made it impossible for investors to be able to compare prior revenues to current revenues on an apples-to-apples basis. Lastly, as to the Gap, I'm sorry. I was going to say, we're over time, so you can make one final point. Oh, I'm sorry. Yeah, the final point I'll make is that contrary to Mr. Tracer's argument and his claim that there were repeated lies and so on and so forth, in fact, this was a very close case as demonstrated by the length of the jury deliberations and the split verdict. In addition, Mr. Petit had little contact with the auditors, and it was not an accountant by training. He relied on the accountants. Okay. Thank you, Your Honor. We'll turn to Mr. Marmot, also on the book. Thank you, Your Honors. I hope to address two points efficiently. The first is with respect to the conscious avoidance charge, whether it should have been given. Mr. Tracer says that this should have shined a bright light. The Anderson email should have shined a bright light that there were problems going on. He does not address, nor do I think he could have, the fact that, as we stated in our brief, the transactions that were identified in the email did not in any way or should not have given Mr. Taylor any reason to believe that there were problems. And in any event, Mr. Taylor understood that other members of the accounting department above Mr. Anderson had approved or reviewed the transactions and said that they were, in their view, recorded properly. There was nothing else for him to do, and there was no information at that point that he believed that Mr. Anderson did not have with respect to those three transactions. The second point I'd like to make is with respect to the question earlier about whether the purposeful introductory sentence of the conscious avoidance charge somehow makes this not inappropriate or saves it. The answer is no. Again, I look back at Kaiser, and the same language appears in Kaiser, and this court said it did not save the instruction. But it's also important to recognize what the sentence about purposefully is saying is closing one's eyes, but not to the fact of a high probability. So, for example, if Mr. Taylor, and this proof showed this as the chief operating officer, said, You know what? I just don't want to deal with the accounting issues. Maybe there's a problem. I don't want to look at it. He's purposely closing his eyes, but he's not doing that to a high probability of the fact that there's illegal conduct afoot. So the purposeful nature of it doesn't solve the problem. It has to be of a high probability. Okay. Thank you very much, Mr. Marmer. The case is submitted.